E-FILED
Thursday, 16 April, 2026 11:33:34 AM
Clerk, U.S. District Court, ILCD
FILED

APR 1 5 2026

CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES DISTRICT COURT

Central District of Illinois

Peoria Division

Jeffrey R. Smith, Plaintiff

v.

Case No: **26-CV-1149**

Caterpillar Inc., Defendant

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# 1. JURISDICTION AND VENUE

This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 et seq. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331.

Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events and omissions giving rise to this action occurred in Peoria County, Illinois, which lies within the Central District of Illinois, Peoria Division.

# 2. PARTIES

Plaintiff Jeffrey R. Smith is an individual residing in Fulton County, Illinois. At all relevant times, Plaintiff was employed by Defendant within the meaning of the ADA and the FMLA.

Defendant Caterpillar Inc. is a corporation doing business in Peoria County, Illinois, and at all relevant times employed the requisite number of employees to be subject to the ADA and the FMLA. Defendant may be served through its registered agent: CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

# 3. FACTUAL BACKGROUND

Plaintiff was employed by Defendant from September 9, 2024 until his termination on December 10, 2025, working at Defendant's Mapleton facility in Peoria County, Illinois. Throughout the first ten months of Plaintiff's employment, Plaintiff worked 244 of the 295 calendar days in that period, including most weekends, with only 51 total days off.

Plaintiff frequently worked two to four hours beyond his scheduled end time, became proficient in multiple positions, trained other employees, and received twelve service awards recognizing his performance.

Plaintiff also reported workplace harassment during the first half of 2025, and those reports were dismissed without investigation; Plaintiff does not assert a separate harassment claim in this action, but these events form part of the overall context in which the subsequent ADA and FMLA issues occurred.

Plaintiff has a medical condition that qualifies as a disability under the Americans with Disabilities Act ("ADA"). Plaintiff's medical condition also qualifies as a serious health condition under the Family and Medical Leave Act ("FMLA"). Plaintiff notified Defendant of his medical limitations and requested reasonable accommodations and protected leave as permitted by federal law.

In July 2025, Plaintiff formally submitted an ADA accommodation request, and Defendant conducted an ADA interview. Defendant denied the request on two stated grounds. First, HR asserted that granting Plaintiff's accommodation would require Defendant to grant similar accommodations to all employees and would result in widespread call-ins and disruption to workflow. Second, HR stated that Plaintiff's written request was too vague because it did not identify specific future dates on which Plaintiff's medical flare-ups would occur.

Plaintiff was not provided a written explanation of the reasons for the denial. Article XIV, paragraph 1 of the collective bargaining agreement states: "If the leave of absence is not approved, or if approved, is later canceled by the Company, the employee shall be so notified in writing with a copy of such notice given to the Union."

Plaintiff also sought leave protections under the FMLA, and Defendant informed Plaintiff that he would not meet the twelve-month employment requirement for FMLA eligibility until December 2025.

During the March 2026 unemployment appeal hearing, Defendant's HR representative denied any knowledge of Plaintiff's July 2025 ADA accommodation request or interview. The HR representative stated that such matters would be handled internally and confidentially and that there would be no paper trail documenting the request or the interview.

On August 29, 2025, Plaintiff began treatment at a gastroenterology clinic, where an assessment and more than a dozen laboratory tests were administered. The clinic scheduled a follow-up appointment for November 29, 2025, and a colonoscopy for December 12, 2025.

Defendant was informed in advance of the August 29 appointment, the nature of the testing performed, the scheduled follow-up appointment on November 29, 2025, and the scheduled colonoscopy on December 12, 2025.

In September 2025, Plaintiff received a three-day suspension for absences directly related to his chronic medical condition, imposed under Defendant's attendance-related disciplinary policy. Under the collective bargaining agreement, employees must meet with union representatives before serving discipline. At that meeting, Plaintiff requested that the Union grieve Defendant's denial of ADA accommodation in July 2025. As Plaintiff left the premises to serve the three-day suspension, the Union informed him that it would attempt to persuade Defendant to reclassify the

suspension as a "redo." Plaintiff received no further information about the redo until October 2025.

In October 2025, Plaintiff was again disciplined for absences caused by his documented medical disability. Defendant imposed a five-day suspension under its attendance-related disciplinary policy. Plaintiff again requested that the Union grieve Defendant's July 2025 denial of ADA accommodation.

Upon returning to duty after serving the five-day suspension, Plaintiff was informed by a Union representative that Defendant had misinformed him about his FMLA qualifying date and that Plaintiff had actually become eligible for FMLA leave in September 2025. The Union representative also informed Plaintiff that the Union had succeeded in having the September three-day suspension placed into redo status. When Plaintiff asked how the redo status would affect the five-day suspension he had just completed, the Union representative stated: "The five day will remain on the books until the outcome of your FMLA accommodation is determined."

Shortly after this conversation, Plaintiff's supervisor sent Plaintiff a text message stating: "I'm sorry but as of now a doctor's note would be necessary for the absence for today. Then if/when your FMLA gets approved it will be worked out from there."

During the March 2026 unemployment appeal hearing, Defendant's HR representative stated that Defendant did not retroactively correct Plaintiff's attendance record after approving his FMLA because "the doctor signed it on November 13th, but attendance violations that occurred before that date don't apply."

On Friday, October 31, 2025, Monday, November 3, 2025, and Tuesday, November 4, 2025, Plaintiff called in daily due to his disability. Defendant approved the absences for Friday and Tuesday but did not approve the absence for Monday. When Plaintiff returned to duty on Wednesday, November 5, 2025, he was placed on indefinite suspension.

Before being informed of the duration of the suspension, Plaintiff asked his supervisor whether he would now be redoing the three-day suspension. The supervisor responded: "No, you will be serving an indefinite suspension at this time." When Plaintiff asked how a five-day or indefinite suspension could be imposed if the three-day redo had never been redone, the supervisor stated: "The three day redo still counts."

Before leaving the premises, Plaintiff again asked the Union to grieve Defendant's July 2025 denial of ADA accommodation.

During the March 2026 unemployment appeal hearing, Defendant's HR representative was asked why Defendant approved the absences for October 31 and November 4 but did not approve the absence for November 3. The HR representative stated that he did not know why the middle day had been left unapproved and could not explain the discrepancy. Nor did the HR representative admit to any knowledge of Plaintiff's three-day suspension having been reclassified as a redo. However, the HR representative did acknowledge that Defendant would not discipline an employee for absences that it had approved.

On November 12, 2025, Plaintiff met with the Union Chair and again requested, verbally and in writing, that the Union grieve Defendant's July 2025 denial of ADA accommodation. The Union Chair stated that medical disputes were beyond the scope of the collective bargaining agreement. Article V, paragraph 7 of the CBA provides: "If, in the Final Step of the local grievance procedure, the Union considers as unsatisfactory the company's decision on a grievance which has as its basic issue a medical disagreement…"

On November 13, 2025, while on final suspension, Plaintiff began treatment with a local family physician who completed and signed Plaintiff's FMLA medical certification. Plaintiff submitted the signed certification to Defendant by email. Defendant approved Plaintiff's FMLA leave on November 19, 2025, but did not reinstate Plaintiff.

On November 20, 2025, a Union representative informed Plaintiff by phone that, if reinstated, Plaintiff would be permitted no more than four call-in days per month and no more than two separate cycles of call-ins per month. No information was provided regarding any progress toward reinstatement.

After receiving no further communication, Plaintiff emailed Defendant on November 24, 2025, asserting his right to timely reinstatement and stating that if reinstatement did not occur within forty-eight hours, he would pursue his grievance externally.

On November 25, 2025, the Union representative informed Plaintiff by phone that HR had stated: "Based upon this email stunt he just pulled, I am not onboard with reinstating him." This was the last communication Plaintiff received from Defendant prior to his termination. After the phone call, Plaintiff submitted an online EEOC inquiry.

On December 5, 2025, Plaintiff received multiple email notifications indicating that Defendant was actively modifying Plaintiff's attendance records retroactively to January 2025. Additional retroactive modifications were reflected in further email notifications on December 8, 2025. Two of those dates were modified multiple times: October 7, 2025 was modified three times on December 5, 2025; October 9, 2025 was modified once on December 5, 2025 and again on December 8, 2025.

During the March 2026 unemployment appeal hearing, Defendant's HR representative was unable to explain why Defendant modified approximately eleven months of Plaintiff's attendance records during the week immediately preceding Plaintiff's termination.

At approximately 18:30 on December 10, 2025, the Union representative informed Plaintiff by phone that he had been terminated. Defendant did not provide verbal notice of termination. After the phone call, Plaintiff submitted an online claim for unemployment benefits.

Plaintiff received written notice of termination by U.S. mail on December 24, 2025; the envelope was postmarked December 19, 2025, and the enclosed letter was dated December 17, 2025. The letter identified attendance as the reason for termination.

On January 10, 2026, Plaintiff received a letter from the Union dated December 10, 2025, stating that the Union had elected to withdraw Plaintiff's grievance. The envelope was postmarked on January 9, 2026. The letter did not indicate the subject matter of the grievance that was withdrawn.

In February 2026, Plaintiff contacted the Union Chair to request that the Union grieve Defendant's failure to release Plaintiff's accrued 2025 vacation time. The Union Chair stated that Plaintiff was not owed the accrued vacation because Plaintiff was no longer employed when the 2026 base period began. Article IX, paragraphs 5, 6, and 7 of the CBA provide that: "The vacation payment shall be an amount in addition to the employee's regular wages and shall be computed as a percentage of the total amount of such regular wages earned by the employee during the preceding payroll year... If an employee is separated from the payroll during the base period, such employee will be paid for any remaining vacation payment as a separation payment... Separation payments will be made at the time the employee is paid his last paychecks, whenever that is possible, but in any event not later than two weeks after the date of separation."

As a result of Defendant's actions, Plaintiff suffered lost wages, lost benefits, and other damages, including 2025 accrued vacation pay, holiday pay, seniority, wage increases, and overtime pay.

# 4. CAUSES OF ACTION

## Count I — Failure to Accommodate (ADA, 42 U.S.C. §12112(b)(5)(A))

Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully restated herein.

Plaintiff is an individual with a disability within the meaning of the ADA. Plaintiff was qualified to perform the essential functions of his position with or without reasonable accommodation.

In July 2025, Plaintiff requested a reasonable accommodation and participated in Defendant's ADA interview process. Defendant denied Plaintiff's request for accommodation for reasons inconsistent with the ADA and Defendant's obligation to provide reasonable accommodation.

Defendant failed to provide Plaintiff with a reasonable accommodation, failed to consider reasonable alternatives, and failed to comply with its duties under the ADA.

As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, lost benefits, and other damages.

Plaintiff seeks all remedies available under the ADA, including back pay, front pay, reinstatement, compensatory damages, punitive damages, and court costs.

## Count II — Retaliation (ADA, 42 U.S.C. §12203)

Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully restated herein.

Plaintiff engaged in protected activity under the ADA when he requested a reasonable accommodation in July 2025.

After Plaintiff engaged in protected activity, Defendant took adverse actions against Plaintiff, including issuing attendance-related discipline for disability-related absences and terminating Plaintiff's employment on December 10, 2025.

Defendant's adverse actions were causally connected to Plaintiff's protected activity and were taken in retaliation for Plaintiff's request for accommodation.

As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered lost wages, lost benefits, and other damages.

Plaintiff seeks all remedies available under the ADA, including back pay, front pay, reinstatement, compensatory damages, punitive damages, and court costs.

## Count III — Interference (FMLA, 29 U.S.C. §2615(a)(1))

Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully restated herein.

Plaintiff was eligible for FMLA leave as of September 2025, having met the twelve-month employment requirement and the hours-worked requirement.

In July 2025, Defendant incorrectly informed Plaintiff that he would not be eligible for FMLA leave until December 2025. Defendant did not correct this misinformation until October 2025, despite Plaintiff already having met the eligibility requirements.

During the period of misinformation, Plaintiff received attendance-related discipline for absences caused by the same medical condition that later qualified for FMLA protection.

Defendant's misinformation, delay in correcting Plaintiff's eligibility date, and discipline for FMLA-qualifying absences interfered with Plaintiff's ability to exercise his rights under the FMLA.

Defendant's violations were willful within the meaning of the FMLA.

As a direct and proximate result of Defendant's interference, Plaintiff suffered lost wages, lost benefits, and other damages.

Plaintiff seeks all remedies available under the FMLA, including back pay, front pay, reinstatement, liquidated damages, and court costs.

## Count IV — Retaliation (FMLA, 29 U.S.C. §2615(a)(2))

Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully restated herein.

Plaintiff engaged in protected activity under the FMLA when he sought leave for his medical condition, submitted medical certification, and obtained FMLA approval in November 2025.

Defendant approved Plaintiff's FMLA leave while Plaintiff was on a final suspension, and Plaintiff was terminated approximately three weeks later, on December 10, 2025.

The timing of Plaintiff's termination, combined with Defendant's prior misinformation and discipline for absences later covered by FMLA, demonstrates that Defendant retaliated against Plaintiff for exercising his FMLA rights.

Defendant's violations were willful within the meaning of the FMLA.

As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered lost wages, lost benefits, and other damages.

Plaintiff seeks all remedies available under the FMLA, including back pay, front pay, reinstatement, liquidated damages, and court costs.

# 5. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and award:

- Reinstatement to Plaintiff's former position at the Mapleton Plant on 2nd Shift in the Large Seals Finishing Department at the Polisher workstation, with full restoration of seniority, back pay, and all benefits as if he had never been terminated, to be completed within fourteen (14) days of judgment; and if reinstatement is not completed within that period, front pay in lieu of reinstatement for the duration of the delay, calculated at Plaintiff's returning rate of pay;
- An order requiring Defendant to correct Plaintiff's personnel records to remove all inaccurate, retaliatory, or unlawful entries, including the termination and any related disciplinary or attendance notations, restoring his record to the condition it would have been in had no unlawful conduct occurred;
- A declaratory judgment that Defendant's conduct violated the ADA and FMLA;
- Compensatory damages under the ADA;
- Punitive damages under the ADA;
- Liquidated damages under the FMLA;

- Pre- and post-judgment interest;
- An award of court costs, including the $402 filing fee and all taxable costs;
- Any other relief the Court deems just and proper.

Plaintiff requests a bench trial.

Respectfully submitted,

Jeffrey R. Smith

Pro Se Plaintiff

545 W. Olive St,

Canton, Illinois, 61520

(309) 218-8461

yhwhfot2027@gmail.com

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/14/2026

**To:** Mr. Jeffrey R. Smith
545 W. Olive Street
CANTON, IL 61520
Charge No: 440-2026-01656

EEOC Representative and email:    CLAIRE GREBNER
INVESTIGATOR
CLAIRE.GREBNER@EEOC.GOV

---

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2026-01656.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
04/14/2026

Amrith Kaur Aakre
District Director